UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA McLEARRAN, | : | Case No. 3:11-cv-195 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND TO BE
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits ("DIB") and Supplemental Security

Income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 21-37) (ALJ's decision)).

**I.**

Plaintiff applied for DIB and SSI on September 27, 2004, alleging an onset date of

April 17, 2003 due to "[t]orn shoulder, lower back and hip injuries, severe depression,

asthma, and high blood pressure, sever alergies. [sic.]" (Tr. 83). Plaintiff's claims were

denied initially and upon reconsideration. (Tr. 51-56, 58-60, 461-464, 466-468). Plaintiff

requested a hearing which was held on October 31, 2007 before the ALJ. (Tr. 711-735).

The ALJ issued his decision on May 29, 2008, finding that Plaintiff was not disabled as

defined by the Social Security Act. (Tr. 469-483). The Appeals Council granted a review

of the decision and remanded the case back to the ALJ for further consideration.

Specifically, the Appeals Council found that: (1) the ALJ's conclusions regarding

Plaintiff's mental impairments were not consistent with the evidence or the regulations;

and (2) the case required further consideration of the opinion of Dr. Smith concerning

Plaintiff's physical impairments. (Tr. 485-485D).

Upon remand, the ALJ held a hearing on February 17, 2009. A medical expert and

psychological expert testified. (Tr. 660-710). The ALJ issued another decision on June

8, 2009, again finding that Plaintiff was not disabled as defined by the Social Security

Act. (Tr. 18-37). Plaintiff then commenced this action in federal court for judicial

review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff was born on March 20, 1968 and is 44 years old. (Tr. 83). She obtained

her GED and attended one year of college, where she had below average grades. (Tr. 99).

Her past relevant work consists of assembler, sedentary and unskilled; assembly of pill

capsules, sedentary and unskilled; assembly line worker, sedentary and unskilled; and

department store worker, light and semi-skilled. (Tr. 703).

The ALJ's "Findings," which represent the rationale of his decision, were as

follows:

1.      The claimant meets the insured status requirements of the Social
        Security Act through March 31, 2008.

2.      The claimant has not engaged in substantial gainful activity since April 17,
        2003, the alleged disability onset date (20 CFR 404.1520(b), 404.1571 *et
        seq*, 416.920(b), and 416.971 *et seq*).

3.    The claimant has the following impairments which are severe for Social Security purposes: dominant right shoulder tendonitis and partial tendon tear, mild dominant right ankle fracture residuals, depressive disorder NOS, and a personality disorder NOS. (20 CFR 404.1520 (c) and 416.920 (c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant lacks the residual functional capacity to: (1) lift more than 10 pounds frequently or 20 pounds occasionally; (2) do any crawling or climbing of ladders or scaffolds; (3) do any reaching above the dominant right shoulder or greater than occasional reaching above the non-dominant left shoulder; (4) work at unprotected heights or around moving machinery; (5) have any contact with the public; (6) have greater than occasional contact with co-workers or supervisors; (7) do other than low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous); or (8) do other than simple, repetitive tasks.

6.    The claimant is not capable of performing any of her past relevant work.

7.    The claimant was born on March 20, 1968 which classified her as a younger individual (20 CFR 404.1563 and 416.963).

8.    The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(Tr. 25-35).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to DIB or SSI. (Tr. 37).

On appeal, Plaintiff argues that: (1) the ALJ erred in rejecting the opinions of Plaintiff's treating physician and psychiatrist and in relying instead on the testimony of the medical experts; and (2) the ALJ erred in failing to consider the combined effect of Plaintiff's physical and mental impairments on her ability to perform work activity. Plaintiff's arguments are interrelated and the Court will address them together.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

-4-

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

Plaintiff was seen in the emergency room on December 22, 2001 for a right shoulder injury that she sustained at work. (Tr. 191-197). She was pregnant at the time. (Tr. 195). She was released and put on light duty with no right arm use until her follow-up exam. (Tr. 197). Plaintiff underwent a MRI of her right shoulder on February 4, 2002 which revealed "mild to moderate tendonosis of the supraspinatus tendon…, mild to moderate impingement…, [and] mild biceps tenosynovitis." (Tr. 190).

On April 18, 2002, Plaintiff was taken by the EMS from work to the emergency room for a sudden onset of pain and tingling in her arms and hands. (Tr. 186). She had a positive left Frankle sign on exam and possible decreased sensation in the right arm. (Tr. 192-193). She was treated with a wrist brace for left arm tendonitis and restricted to light duties with limited use of power tools. (Tr. 181, 187). Plaintiff was prescribed physical therapy and not given medications because of complications with her pregnancy. (Tr. 218).

On March 15, 2002, the examination revealed no objective findings and it was noted that Plaintiff might be leaving work due to complications with her pregnancy. (Tr. 210). On March 27, 2002, Plaintiff was limited to lifting ten pounds and needed to sit periodically at the request of her ob/gyn. (Tr. 208). She complained of bilateral hand numbness and was diagnosed with parethesias[1] bilateral hands. (Tr. 204). She was seen on April 29, 2002 for right shoulder sprain and bicipital tenosynovitis.[2] Her range of motion was restricted and she had tenderness on palpation. (Tr. 199). Plaintiff gave birth to her daughter on July 12, 2002. (Tr. 229-243).

Plaintiff was treated from September 9, 2003 to December 18, 2003 for impingement syndrome[3] and possible rotator cuff tear. She had a restricted range of motion and atrophy of the rotator cuff. (Tr. 252). Plaintiff underwent an arthroscopic surgery on October 8, 2003 (Tr. 248-250) and although she was doing well, she continued to have discomfort (Tr. 244, 246-247).

Plaintiff was evaluated on March 25, 2004 by Dr. Malcolm Meyn, Jr., an orthopedic surgeon, in conjunction with her workers compensation claim. He related that Plaintiff had frequently operated a torque wrench during the course of her job duties and

---

[1] Parethesias is sensation of tingling, burning, pricking, or numbness of a person's skin.

[2] Tenosynovitis is tendinitis or inflammation of the tendon and sheath lining of the biceps muscle.

[3] Impingement syndrome occurs when the tendons of the rotator cuff muscles become irritated and inflamed.

that this frequent usage had caused her shoulder to pop and become painful.  She returned to light duty assembly work that did not require much physical activity.  (Tr. 254).  An MRI demonstrated impingement and Plaintiff underwent surgery on October 8, 2003.  The surgery did relieve some of the pain and gave her more range of motion of her right shoulder, but she still had chronic pain.  On examination, she had prominence of her right shoulder, limited range of motion of her right shoulder, and some decreased sensation of the right third, fourth, and fifth fingers.  Dr. Meyn reported that she did not seem to be putting forth full effort.  (Tr. 255).  He opined that she did have right shoulder impingement syndrome, that she had been temporarily and totally disabled since October 8, 2003, and that she had not reached maximum medical improvement.  (Tr. 258).

Dr. Thomas Konicki, a chiropractor, evaluated Plaintiff on April 28, 2004, in conjunction with her workers compensation claim.  His examination revealed dropped left hemipelvis, restricted lumbar range of motion, decreased Achilles tendon reflexes, decreased sensation, problems with heel and toe walking and squatting, atrophy above the knee on the left, positive straight leg raising test, muscle spasms, tenderness, decreased range of motion of her left hip, decreased strength in her left hip, and tenderness of her left hip.  (Tr. 260-261).  He found that Plaintiff had a chronic sprain of her lumbar region and that she had a 14% impairment of her whole person.  (Tr. 261).

Dr. Aivars Vitols, an orthopedic surgeon, evaluated Plaintiff on June 10, 2004 in conjunction with her workers compensation claim.  She related an earlier injury in 1999

when she was struck by a forklift.  She was off work for three weeks and the later

changed employment.  Plaintiff complained of coccygeal pain[4] with numbness in both

lower extremities and episodes of her legs giving out.  (Tr. 262).  Plaintiff had a slow,

antalgic gait, generalized tenderness, some muscle spasms, and a reduced range of motion

of her lumbar spine.  (Tr. 263).  Dr. Vitols gave Plaintiff a whole person impairment of

3%.  (Tr. 264).

A physical therapy note dated August 20, 2004 showed that Plaintiff was treated

for lumbar spine stiffness, but she missed three of eight sessions.  (Tr. 341).

Plaintiff underwent another examination, by Dr. Gordon Zellers, on March 24,

2005, also in conjunction with her workers compensation claim for her right shoulder

injury.  (Tr. 266).  She had pain on palpation, reduced range of motion, some sensory

decrease, some strength decrease, and decreased to absent reflexes.  He opined that

Plaintiff had 11% permanent partial impairment of the whole person.  (Tr. 266)

Dr. Jerry Flexman, psychologist, evaluated Plaintiff on December 7, 2004.  Dr.

Flexman reported that Plaintiff's effort and concentration was good, her intelligence was

average, reliability was fair, and moderate malingering was suggested.  Effort on

immediate memory was poor but good for recent memory.  She was unable to

acknowledge the presence of psychological issues. She "did not have a realistic degree of

recognition for the amount that [her] impairment had on [her] ability to function."  (Tr.

---

[4]  Coccygeal pain is also known as tailbone pain.

270).  He noted, "[o]bessive thinking concerning somatic or other psychological problems was judged to be out of proportion with reality and somatization was present."  *Id.*  The diagnosis was major depression; somatoform disorder;[5] malingering; personality disorder, with a GAF of 55.[6]  *Id.*  Plaintiff had a slight restriction in her ability to understand, remember, and carry out and make judgments for short, simple job instructions.

Dr. Kristen Haskins, a non-examining psychologist, reviewed the record on January 13, 2005.  (Tr. 274).  She opined that Plaintiff was moderately limited in her ability to complete a normal workday or workweek without interruptions from psychologically based symptoms, accept instructions or criticism from supervisors, and her ability to respond appropriately to changes in the work setting was moderately limited.  (Tr. 273).  She opined that Plaintiff was mildly restricted in her daily activities and moderately restricted in her social functioning and in maintaining concentration, persistence, or pace.  (Tr. 286).  She found that Plaintiff was "capable of moderately complex tasks in an environment without strict production quotas" and she was "capable of superficial interaction with supervisors, co-workers, and the public."  (Tr. 274).  Her assessment was affirmed on April 2, 2005 by Dr. Caroline Lewin, another non-examining

[5]   Somatoform disorder is a mental disorder characterized by physical symptoms that suggest physical illness or injury – symptoms that cannot be explained fully by a general medical condition.

[6]   The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning adults, e.g., how well or adaptively one is meeting various problems-in-living.  A GAF scale of 51-60 indicates moderate symptoms (e.g., flat affect and circum-stantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

psychologist. (Tr. 274).

The record was also reviewed by Dr. Jerry McCloud, a non-examining physician, on January 14, 2005. (Tr. 297). Dr. McCloud opined that Plaintiff could occasionally lift/carry up to twenty pounds and frequently lift/carry up to ten pounds and could stand/walk for six hours out of eight and sit for six hours out of eight. (Tr. 291). She was never to climb ladders, rope, or scaffolds, and she could occasionally kneel and crawl. (Tr. 292). His assessment was affirmed on April 5, 2005 by Dr. Eli Perencevich, another non-examining State agency reviewer. (Tr. 297).

On February 7, 2005, Plaintiff's treating physician, Dr. Kwasi Nenonene, completed a Basic Medical form. Dr. Nenonene diagnosed hypertension, asthma, depression, anemia, lower back pain, and right shoulder pain. Dr. Nenonene based his opinion on her office visits and medical records. He opined that she could stand/walk for two hours out of eight and uninterrupted for two hours and sit for two hours out of eight and uninterrupted for two hours. Office notes show that Plaintiff was treated for right shoulder pain due to her partial rotator cuff tear and depression. She had tenderness, decreased strength of her right shoulder, and right ankle pain. (Tr. 300-301). Dr. Nenonene concluded that she was unemployable for twelve months or more. (Tr. 299).

Records from Urgent Care, dated December 1, 2002 through August 15, 2005, were submitted. Plaintiff was treated for a left knee injury on April 26, 2003 (Tr. 307); she was seen for her hypertension on May 8, 2003 (Tr. 306); she was treated for left leg injuries sustained when she fell down stairs on May 27, 2004 (Tr. 305); and she was

treated for right foot injuries sustained when she ran into a coffee table on August 15, 2005 (Tr. 303).

Dr. Enrique Martinez, an orthopedist, evaluated Plaintiff on August 17, 2005. (Tr. 309-311). On exam, she had some paresthesias of the fourth and fifth finger of the right hand and very restricted range of motion of her right shoulder. X-rays revealed a non-functioning rotator cuff. (Tr. 309). She was referred to Dr. Klosterman for an evaluation. (Tr. 310).

Treatment records from Advanced Therapeutic Services, Inc., dated November 2, 2004 through September 22, 2005, were submitted. Plaintiff was initially evaluated on November 2, 2004 and related that her depression was worse because she could not get anything for Christmas for her two-year old daughter, and her cousin, with whom she had been close, had been murdered recently. She had passive suicidal ideation. She claimed that she was the victim of an attempted molestation when she was twelve and was physically abused by her brother. She no longer attended church as a result of agoraphobia.[7] (Tr. 338). Plaintiff was diagnosed with major depression, panic disorder with agoraphobia, and acute stress disorder. (Tr. 339).

Plaintiff's treating psychiatrist, Dr. Rahman, completed interrogatories on July 17, 2006. (Tr. 345-353). Plaintiff's diagnoses were PTSD, major depression, and panic disorder with agoraphobia. He stated that the combined effects of her physical and

---

[7]    Agoraphobia is an anxiety disorder characterized by anxiety in situations where it is perceived to be difficult or embarrassing to escape.

mental impairments could be greater than the sum of the parts. (Tr. 346-347). Her physical problems worsened her stress and anxiety which caused a worsening of her depression. (Tr. 347). Dr. Rahman opined that Plaintiff was unable to be prompt and regular in attendance as she suffered from post partum depression after the birth of her daughter and never recovered from it. She could not respond appropriately to supervision, co-workers, and customary work pressures, as her agoraphobia caused panic attacks when she was around other people for any length of time. (Tr. 348). Dr. Rahman concluded that due to her physical impairments, she could not work consistently, she could not work with others, and she responded poorly to criticism. (Tr. 351). From August 14, 2006 through April 9, 2007, Plaintiff's symptoms were marked as improved, except for June 18, 2006, when it was noted that her symptoms had not improved. (Tr. 399-407, 451-456).

Plaintiff was evaluated by Dr. William Smith on June 4, 2007. She had complaints of pain in her right shoulder, left wrist, right knee, and right ankle. In addition to surgery for her right rotator cuff tear, she also had surgery for fractures to her left wrist and right ankle that she sustained during a fall. She stayed in bed a great deal of the time and her mother helped with her daughter. She drove infrequently and used her left ankle when doing so. Dr. Smith diagnosed right shoulder rotator cuff injury and supraspinatus[8] injury, residual right ankle fracture, residual left wrist fracture, degenerative arthritis both

---

[8] The supraspinatus is a relatively small muscle of the upper arm and one of the four rotator cuff muscles.

hips, benign hypertension, asthma, and bipolar disorder. (Tr. 409-411, 413-415). He noted that she had a restriction in her ability to sit, walk, lift, and carry, but she had some symptom magnification. (Tr. 411). He opined that Plaintiff could lift/carry up to ten pounds occasionally, but could not walk a block at a reasonable pace on rough or uneven surfaces. (Tr. 416). Dr. Smith opined that limitations would last for more than twelve months. (Tr. 421). On November 29, 2007, Dr. Smith submitted an addendum, stating that on strength testing during the exam, Plaintiff's hand strength was normal and that Plaintiff could sit for four hours instead of three, could walk for two hours, and stand for two hours. (Tr. 457).

Dr. Giovanni Bonds, psychologist, evaluated Plaintiff on July 17, 2007. Plaintiff gave a history of no abuse, but Dr. Bonds noted that she had reported sexual abuse to Dr. Flexman. (Tr. 422-423). She had broken up with her child's father after an eight-year relationship due to his cheating on her. (Tr. 423-424). She related that she was depressed, had problems sleeping since her cousin's murder, ate excessively, had problems with her temper, became easily angered and physically aggressive, had mood swings, had a loss of sexual drive, and was tired all the time. (Tr. 425). She functioned in the borderline to low average range of intellectual functioning. (Tr. 426). Plaintiff had immediate and general memory indexes in the average range and a working memory index in the borderline range, with a word reading score at the 12.2 grade level, sentence comprehension at the 12.0 grade level, spelling at the 9.6 grade level, and math computation at the 5.7 grade level. (Tr. 427). Diagnoses included major depressive

disorder; PTSD; and panic disorder with agoraphobia. She was assigned a GAF of 50.[9]

Plaintiff's ability to relate to others was moderately impaired as was her ability to deal

with work stress and pressure. (Tr. 429-430). Dr. Bonds noted, "[s]he would have

difficulty handling interpersonal stress at work. She has unstable moods and poor coping

skills. She would have difficulty with working consistently and meeting demands for

speed, accuracy, and productivity." (Tr. 430). Although Dr. Bonds found that Plaintiff

was moderately limited in her ability to interact appropriately with the public, supervisors,

and co-workers and respond appropriately to usual work situations and to changes in a

routine work setting, she stated:

> Rhonda is severely depressed. She is nervous & afraid to be
> around people. She withdraws. She lacks trust in others, gets
> aggravated easily, and does not have interest in interacting with
> people. She also has a tendency to be oppositional & get into
> conflict [with] authority figures.

(Tr. 435). She also reported that Plaintiff's "[a]bility to work consistently, without

excessive breaks was affected by her impairments." (*Id.*)

After the Appeals Council remand, Dr. Nenonene submitted his office notes dated

September 13, 2007 through May 22, 2008. (Tr. 505-511). Plaintiff continued to receive

treatment for her right shoulder pain, right ankle pain, bilateral leg pain, lower back pain,

depression, and anxiety. *Id.* She underwent a closed reduction procedure for the right

trimalleolar ankle fracture on March 11, 2006, prior to her open reduction surgery on

---

[9] A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job).

March 21, 2006. (Tr. 342-344, 512-525). She sustained the injury when she fell off of a curb. (Tr. 515). After her fall, she was seen in the ER on March 19, 2006 for injuries sustained in another fall. (Tr. 528). Plaintiff was treated with a closed reduction and surgery was scheduled the following day for an open reduction of both her left wrist and right ankle. (Tr. 529, 541-544).

Dr. Donald Ames, Plaintiff's treating orthopedic surgeon, submitted his office notes, dated March 20, 2006 through May 31, 2006. He submitted April 3, 2006 x-ray reports that showed good position of her right ankle fixation and good position of her comminuted distal radius fracture and ulnar styloid fracture of her left wrist. (Tr. 554). April 24, 2006 x-rays also showed healing fractures in good position. (Tr. 551). On that date, Dr. Ames found that Plaintiff was healing and could start activity with her left wrist and left ankle as tolerated. (Tr. 548). Dr. Ames evaluated Plaintiff's right shoulder on May 31, 2006. She had a positive impingement sign and some weakness of the rotator cuff. She was walking with a minimal limp on the right ankle. He gave Plaintiff an injection and put her on a strengthening program. (Tr. 546).

Dr. Rahman gave Plaintiff a diagnostic evaluation and completed interrogatories on January 12, 2009. Dr. Rahman reported that during the mental status evaluation, she "often looks overwhelmed, confused, apprehensive [with] irritability. She displays paucity of thought/speech [with] considerable psychomotor retardation. Insight & judgment are fair." (Tr. 613). The diagnoses were bipolar affective disorder & severe

panic disorder. Plaintiff was assigned a GAF of 40-45.[10] Dr. Rahman opined that

Plaintiff could not "engage in any meaningful & productive work force" and that her

underlying physical condition "exacerbates the whole situation considerably." (Tr. 616).

He stated:

> To begin with, patient has poor coping and social skills and tends
> to be an introvert. Superimposed are her physical and emotional
> conditions [with] considerable depression, anxiety, & impaired
> concentration with has a tendency to enhance the perception of
> pain and make her more vulnerable.

(Tr. 616). He opined that Plaintiff could not perform any of the mental activities needed

for work because of her unpredictable and erratic panic attacks and her poor coping skills.

(Tr. 617-622). She had a moderate restriction in her daily activities and a marked

impairment in her social functioning and concentration, persistence or pace. (Tr. 622-

623). She had poor to no ability to follow work rules, use judgment, deal with work

stress, function independently, maintain attention and concentration, relate predictably in

social situations, demonstrate reliability, and understand, remember, and carry out even

simple job instructions. (Tr. 624-626). However, Dr. Rahman's office notes dated

October 12, 2007 through January 9, 2009 indicate that Plaintiff's mental condition was

in a stable or improved condition during treatment sessions. (Tr. 627-643).

    Dr. Nenonene submitted his office notes dated January 2, 2008 through March 12,

2009. Plaintiff was seen for right shoulder pain, bilateral leg parenthesias, lower back

---

[10]    A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job).

pain, and fatigue. She had right shoulder tenderness, positive straight leg raising test, antalgic gait, calf tenderness, and muscle spasms. (Tr. 644-647, 650-655, 657-659). A July 29, 2008 EMG of her lower extremities revealed no peripheral neuropathy. (Tr. 656).

**B.**

Plaintiff argues that the ALJ erred in rejecting the opinions of her treating physician and psychiatrist and in relying instead on the testimony of the medical experts. Additionally, Plaintiff alleges that the ALJ erred in failing to consider the combined effect of her physical and mental impairments on her ability to perform work activity.

The ALJ determined that Plaintiff had the RFC to perform light work activity that limited her from crawling or climbing ladders or scaffolds, reaching above with her right shoulder, reaching more than occasionally with her left shoulder, working at unprotected heights, working around moving machinery, having contact with the public, having more than occasional contact with supervisors and co-workers, and performing more than low stress, simple, repetitive tasks work activity. Low stress work was defined as "no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous." (Tr. 29). The ALJ based these physical restrictions on the assessments of the two non-examining state agency reviewers. (Tr. 29).

In researching his decision, the ALJ considered the objective medical evidence, including that which showed no hip abnormality (the 2007 MRI); no lower back

impairment (the 2004 back x-ray and the 2008 leg EMG); no hand/wrist limitations (the reports of Drs. Smith and Martinez); and no knee limitations (the 2004 MRI and the findings by Dr. Smith) (Tr. 26-35). The ALJ also noted the lack of evidence of continuing problems with Plaintiff's ankle (Tr. 26-34).

The ALJ also considered the various contradictory opinions in the record.[11] Specifically, the ALJ evaluated the opinion of Dr. Nenonene and observed that he was a treating family practice physician.[12] The ALJ concluded that the treatment records did "not reflect such serious physical limitations that would support" Dr. Nenonene's opinion. (Tr. 33). Vague references to "medical records" and "office visits" were all that Dr. Nenonene offered as support. (Tr. 398-99). *See, e.g., McClanahan v. Astrue*, 1:10cv651, 2011 U.S. Dist. LEXIS 126815, at *13 (S.D. Ohio Feb. 16, 2011) ("the essential problem with the four pages of forms that make up [the doctor's] opinion is that it is entirely conclusory. Other than stating that his observations are based on physical exams and history, [the doctor] gives no indication of what evidence his opinion is based on"). While Dr. Nenonene provided several pages of records, the records did not show that he either treated Plaintiff for impairments causing the limitations he recommended or that he ever documented any signs consistent with his recommendations. Dr. Nenonene found

---

[11]   It is the Commissioner's function to resolve conflicts in the medical evidence. *Felisky,* 35 F.3d at 1036.

[12]   If the opinion of a treating source is not accorded controlling weight, the ALJ must consider factors such as the doctor's specialization, in determining the weight to give the opinion. *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).

Plaintiff incapable of work a full year prior to her traumatic wrist and ankle injuries and in fact, the brief form that constitutes Dr. Nenonene's opinion cites to only "lower back pain" and "R shoulder pain" as medical conditions, even though pain is neither a diagnosis nor a clinical sign. (Tr. 298). On this same form, Dr. Nenonene admitted that Plaintiff's neurological functioning was grossly normal and that she had full range of motion in her back and all joints, including her shoulder. (Tr. 298). *Ball v. Comm'r of Soc. Sec.*, 1:09cv684, 2010 U.S. Dist. LEXIS 141645, at *19 (S.D. Ohio Sept. 7, 2010) ("where a physician's conclusions to support a conclusion regarding a claimant's capacity contain no substantiating medical data or other evidence, the ALJ is not required to credit such opinions"). Moreover, the record did not support a conclusion that any alleged back impairment was disabling, even in conjunction with Plaintiff's shoulder problems. (Tr. 26-27, 29).[13]

Dr. Lyons, the medical expert, testified that he had no evidence to explain Plaintiff's complaints of ankle pain and that Plaintiff should not have continuing pain as a result of her ankle fracture. (Tr. 685-86). The record did contain post-surgical x-rays of Plaintiff's ankle and they showed good positioning. (Tr. 549, 551, 554). Similarly, orthopedist Dr. Ames found full pronation and supination in Plaintiff's ankle post-surgically in May and June and indicated that Plaintiff did not require any further treatment for her ankle. (Tr. 547-48).

---

[13] In an effort to rebut the ALJ, Plaintiff cites treatment records that post-date the ALJ's opinion. These records cannot be deemed supporting evidence. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

With respect to Plaintiff's back and wrist, the medical expert testified that Plaintiff had received very little treatment for her back and noted that an EMG was negative. (Tr. 686). Accordingly, the evidence in the record supports a finding that Plaintiff did not have a severe back impairment. Similarly, there was no recent x-ray for Plaintiff's wrist.

Plaintiff also argues that Dr. Smith's opinion supported Dr. Nenonene, but she ignores several important facts. First, Dr. Smith opined that Plaintiff could do a range of sedentary work (Tr. 416-17, 457), whereas Dr. Nenonene indicated that Plaintiff could only sit and stand/walk for a total of four hours. (Tr. 299). When one doctor opines that a claimant can work and another opines that the claimant cannot, the opinions cannot be said to support each other. To the extent that Dr. Smith found more limitations than the ALJ accepted, the ALJ explained how he evaluated the opinion. (Tr. 32-33). For example, the ALJ noted that there was a gross disconnect between Dr. Smith's clinical findings and his recommendations. (Tr. 33). Dr. Smith limited Plaintiff in part due to back pain, but made no diagnosis as to her back. (Tr. 410-11, 416-17). As already discussed, the ALJ had good reasons to discredit this opinion based on allegations of back pain. Similarly, Dr. Smith based his opinion in part on ankle pain, but the ALJ properly disposed of that issue in his decision as well. Likewise, Dr. Smith cited to hip pain (Tr. 419), but a hip MRI was normal (Tr. 27, 439-40). Moreover, Dr. Smith found "symptom magnification" but still limited Plaintiff based on reports of pain. (Tr. 411, 416-17). Additionally, Dr. Smith purported to find Plaintiff limited as of 2002, even though her ankle injury did not occur until 2006. (Tr. 421). Therefore, the ALJ had good reason to

-20-

reject Dr. Smith's limitations on sitting and standing/walking.

With respect to her mental RFC, Plaintiff contends that the medical expert, Dr. Pitcher, agreed that Dr. Rahman was in the best position to opine about Plaintiff's limitations, and therefore the ALJ should have adopted Dr. Rahman's opinion. While the regulations recognize that the treating physician is presumed to be in the best position to consider a claimant's relevant impairments and limitations, they also recognize that the treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). *See also Price v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th Cir. 2009) ("because [the treating physician] failed to identify objective medical findings to support his opinion [on a questionnaire] regarding Price's impairments, the ALJ did not err in discounting his opinion").[14] In fact, the medical expert noted that "its unfortunate that he [Dr. Rahman] didn't document his opinion." (Tr. 701). Dr. Rahman's treatment notes show no clinical findings, no concentration problems, no anxiety problems, almost-normal mental status examinations, and improving symptomology. (Tr. 354-60, 399-407, 451-46, 627-43).

Plaintiff also ignores the contrary opinions of Dr. Pitcher, Dr. Flexman, and Dr. Bonds. Dr. Bonds's documented memory testing contradicted Dr. Rahman's conclusion on Plaintiff's ability to remember and concentrate (which was not backed up by any

---

[14] A treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527 (d)(2).

testing or documented observation).  (Tr. 34, 692-93).  Dr. Bonds found no impairments in multiple functional categories and only moderate impairments in other categories.  (Tr. 429-30, 434-36).  Dr. Flexman also opined that plaintiff had only slight or moderate limitations.  (Tr. 28, 30, 35, 271).  Similarly, Dr. Pitcher gave an opinion at odds with Dr. Rahman.

While Plaintiff may disagree with the ALJ's decision, his decision is clearly within the "zone of choices" afforded to him.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference.").  The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence.

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Rhonda McLearran was not entitled to disability insurance benefits, is found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and it is **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

Date:  4/9/10                                          _s/ Timothy S. Black_
                                                       Timothy S. Black
                                                       United States District  Judge